```
 1                     UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3     UNITED STATES OF AMERICA,         Case No. 1:11cr368
                                         Akron, Ohio
 4                Plaintiff,             Monday, October 1, 2012

 5          vs.

 6     PEARLINE RICHARDSON,

 7                Defendant.

 8
                          TRANSCRIPT OF PROCEEDINGS
 9           BEFORE THE HONORABLE DAVID D. DOWD, JR.
                   UNITED STATES DISTRICT JUDGE
10

11                         SENTENCING HEARING

12

       APPEARANCES:
13
       For the Government:        Michael A. Sullivan
14                                Assistant United States Attorney
                                  Northern District of Ohio
15                                Suite 400
                                  801 Superior Avenue, W
16                                Cleveland, Ohio  44113
                                  (216) 622-3977
17

18     For the Defendant:        Carolyn M. Kucharski
                                  Edward Bryan
19                                Office of the Federal Public
                                  Defender - Cleveland
20                                Northern District of Ohio
                                  750 Skylight Office Tower
21                                1660 West Second Street
                                  Cleveland, Ohio  44113
22                                (216) 522-4856

23

24

25


                Lori A. Callahan, RMR-CRR      (330) 252-6022
```

```
 1

 2

 3    Court Reporter:              Lori Ann Callahan, RMR-CRR
                                   United States District Courthouse
 4                                 Room 568
                                   2 South Main Street
 5                                 Akron, Ohio  44308
                                   (330) 819-8676
 6

 7

 8

 9

10    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2                         -   -   -

 3          THE COURT:  The court calls the case United States

 4     versus Pearline Richardson.

 5          The court has received the presentence report, and

 6     I'll ask the defendant, have you had the opportunity to

 7     review the presentence report?

 8          THE DEFENDANT:  Yes.

 9          THE COURT:  Were there any additions or

10     corrections that the defendant wished to bring to the

11     court's attention with respect to the presentence report?

12          I don't seem to have the report, Debbie.

13          COURTROOM DEPUTY CLERK:  It's right there.

14          MR. BRYAN:  Your Honor, just for the record, there

15     were disagreements as it related to the government's version

16     of the events as it relates to the investigation, but those

17     issues have been addressed and there's not an objection

18     raised or request to change that information because that's

19     the government's version of the events.

20          THE COURT:  All right.  Well, to quickly

21     summarize, the offense level is first discussed at page 14

22     of the presentence report, and it indicates that the base

23     offense level is a 30, and it adds two levels.  The first

24     two levels are added because Sentencing Guidelines

25     2G1.3(b)(3) states that "If the offense involved the use of
```

1    a computer or interactive computer service to (A) persuade,

2    induce, entice, coerce, or facilitate the travel of the

3    minor to engage in prohibited sexual conduct; or (B) entice,

4    encourage, offer, or solicit a person to engage in

12:09:04   5    prohibited sexual conduct with the minor, increase by two

6    levels."

7           In this matter, the defendant took a photograph

8    that the defendant used to advertise on Backpage.

9           The second specific offense characteristic is that

12:09:20  10    "If the offense involved the commission of a sex act or

11    sexual contact, then increase by two levels."

12           In this case, the minor, S.J., clearly was

13    subjected to a sex act or a sexual conduct; add two more

14    levels.  That gets us to 34.

12:09:36  15           There's a reduction of three levels for acceptance

16    of responsibility, and I gather the government agrees with

17    the third level for acceptance?

18           MR. SULLIVAN:  We do, Judge.

19           THE COURT:  So the adjusted offense level is 31.

12:09:50  20    So the total offense level is 31.

21           The defendant's criminal history category is Roman

22    Numeral IV, as I understand it.

23           Is there any objection to the Roman Numeral IV

24    criminal history category?

12:10:20  25           MR. BRYAN:  No, Your Honor.

1              THE COURT:  And then that leaves us with a

2    sentencing range of 151 to 188 months.  There's a mandatory

3    minimum of ten years, as I understand it.

4              And does the government have any recommendation

12:10:44  5    under 5K1.1?

6              MR. SULLIVAN:  No, Judge, we do not.

7              THE COURT:  The defendant's counsel submitted a

8    very lengthy sentencing memorandum in favor of the

9    defendant.  It's been quite well done.  And it is -- it is

12:11:10  10    obviously the basis of a motion for a downward variance.

11              Is that agreeable?

12              MR. BRYAN:  That is, Your Honor.

13              THE COURT:  Would you like to summarize it in any

14    way?  I know you've done a great deal of work in this case.

12:11:29  15              MR. BRYAN:  Your Honor, I would, and also, just

16    for the record, I want to address the issue of the

17    government's motion for substantial assistance.  And, quite

18    frankly, I think some of what I am about to say regarding

19    that is in mitigation for Ms. Richardson as well as it

12:11:46  20    relates to her willingness to be cooperative.

21              As the court may have been aware or as the court

22    may remember, this case literally settled on the eve of

23    trial.  There was a lot of back and forth over the -- the

24    months or the weeks leading up to the actual trial date in

12:12:05  25    this case.

1          And this began as a multiple-count indictment,

2     which ultimately resulted in Ms. Richardson by pleading by

3     way of plea agreement to just the one count, the count

4     involving the underaged individual in prostitution, S.J.  As

12:12:22  5     part of the plea agreement leading up to that, the

6     government agreed to allow Ms. Richardson to proffer and to

7     take into consideration the information that she provided in

8     determining whether or not the government then will make a

9     separate motion for downward departure, which could relieve

12:12:40 10    Ms. Richardson of the mandatory minimum.

11          As the court may remember from the change of plea

12     and things that have happened since that time,

13     Ms. Richardson was very much concerned about trying to earn

14     the government's motion so that she could try to get a

12:13:00 15    sentence below the mandatory minimum sentence of ten years.

16          It was her desire from the beginning of the case

17     not to avoid responsibility for her criminal conduct, but to

18     have it all put in the proper perspective so that she didn't

19     go to prison for an extremely lengthy period of time, a

12:13:19 20    period of time that she believes, ten years, would be an

21     extremely lengthy period of time, and her motivation all

22     along was her family and her children.

23          She has a 14-year-old son, I don't know if he's

24     turned 15 since then, who's now living with her oldest

12:13:37 25    child, her daughter, in Florida.  And she's doing a very

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    good job, along with her husband, helping care for him.

2    They're all in court today, by the way, having traveled the

3    900 miles north from Florida to be here on their mother's

4    behalf for sentencing.  Other family members are in the

12:13:55  5    courtroom as well.

6          And that was -- but Ms. Richardson was never

7    trying to avoid responsibility.  She was trying to avoid a

8    lengthy sentence.  And she sat down with the government on

9    two occasions.

12:14:10  10          I was present during the first occasion, and

11    Ms. Kucharski was present during the second occasion.  In

12    our perception, and also I believe in the agent's

13    perception, Ms. Richardson gave information in a truthful

14    manner.  The information that she provided regarding her

12:14:26  15    knowledge of sex trafficking in the City of Cleveland

16    involved information regarding S.J. and how she met S.J. and

17    the fact that she was exploited by some other individual who

18    was running an after-hours club and was prostituting S.J. at

19    this after-hours club.

12:14:45  20          This other individual is known to the government;

21    obviously, is known to Ms. Richardson.  He's been identified

22    by the street name of Tokyo, but the government knows who

23    that individual is and has not only identified him, but has

24    investigated him as well.

12:15:01  25          Unfortunately, I don't believe they believe that

1    Ms. Richardson's words alone, maybe even if S.J. would

2    acknowledge that she worked on this gentleman's behalf,

3    would be sufficient to try to bring a case against him.

4         But in addition to that information,

12:15:17  5    Ms. Richardson had knowledge of other criminal conduct that

6    she provided to the government's agents.

7         And just this past Wednesday afternoon, and I

8    think it's important, just for the purposes of the record,

9    we received an E-mail from Agent Kolonick, who's at the

12:15:37  10   government's table today, which stated the following:

11        "All:  Today I spoke with Special Agent Frank

12   Brown, IRS.  He has all the information and they're looking

13   into it.  The main problem is is we have no idea where the

14   subject has her bank accounts.  This is going to take time

12:15:52  15   and there is no way we will have any results before

16   sentencing.  IRS has to show a significant loss or several

17   subjects before they can open a full case.

18        "As I mentioned, I believe Pearline Richardson is

19   telling the truth, but the information is dated and by no

12:16:09  20   means significant at this time.

21        "I wanted all of you to know where we are with

22   this information given during the proffer.  If you have any

23   questions, let me know."

24        In essence, Ms. Richardson provided information to

12:16:19  25   the agents during her proffer that concerned an individual

                    Lori A. Callahan, RMR-CRR      (330) 252-6022

1    whom Ms. Richardson knows who was engaged in preparing false

2    income tax returns, not only, in fact, was a customer of

3    hers during a period of time when she submitted income tax

4    returns that were fraudulent and which resulted in

12:16:43    5    individuals getting refunds to which they weren't entitled.

6         And the allegation was this was done on a very

7    large scale, and even while this person was working for a

8    tax preparer's office, so it is significant information.

9    Unfortunately, the government has not had the opportunity to

12:17:01    10    fully investigate that.

11         Notwithstanding that, I've been in federal

12    sentences in the past where information have provided

13    similar truthful information that the government has begun

14    investigations with and they were still in a position to be

12:17:15    15    able to make a motion, even if it was just for a level of

16    substantial assistance.

17         But the government's choosing not to do that in

18    Ms. Richardson's case; and, admittedly, the government has

19    wide discretion to be able to do that.  But for the sake of

12:17:29    20    the record, I wanted to place this on the record, because

21    obviously, their discretion isn't to the extent that they

22    can't refuse to seek substantial assistance for an

23    unconstitutional reason such as race or religion or

24    something like that.

12:17:47    25         I am not alleging that at all.  I'm not alleging

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    that the government's not choosing to exercise their

2    authority, their discretion to move at this time for

3    substantial assistance for Ms. Richardson because of an

4    unconstitutional reason.  But, however, the cases go on to

12:18:04  5    say that there has to be a substantial threshold showing of

6    an improper motive; and, quite frankly, I'm not sure that I

7    am able to demonstrate an improper motive at this time as

8    well.

9           But if I don't make the record at sentencing, then

12:18:20  10   I -- it's plain error on review and I don't have the

11   opportunity to argue it later.

12          But I believe that Ms. Richardson held up her end

13   of the bargain.  I believe she cooperated in good faith.  I

14   believe she provided truthful information to the government.

12:18:35  15   I believe that information was helpful to the government as

16   it related to all the information that Ms. Richardson

17   provided; albeit, it may be dated, according to the

18   government, but I believe at least as it relates to this one

19   instance, there is significant information for the

12:18:51  20   government to go forward as it relates to this IRS

21   investigation regarding tax fraud.

22          And just for the record, I believe that

23   Ms. Richardson has done everything she needed to do to earn

24   substantial assistance and just want to place that on the

12:19:06  25   record before I go too far into it.

1        THE COURT:  Very well.  I am concerned about

2    paragraphs 74, 75 and 76 in the presentence report.  I will

3    read into the record what they set forth.

4        "On July 21, 2011, while being transported to the

12:19:28  5    Cuyahoga County Jail by the U.S. Marshal Service as an

6    inmate in the instant federal case, the defendant threatened

7    an FBI task force officer.

8        "She was heard stating the FBI agent should be

9    shot.  She admitted to her statement when confronted.  She

12:19:46  10    explained she made a threat because she was upset about her

11    case and she apologized to the Deputy U.S. Marshal

12    continuously."

13        Next paragraph, "On July 26, 2011 and August 1,

14    2011, while an inmate in instant federal case, being housed

12:20:07  15    at the Cuyahoga County Jail" -- I didn't state that quite

16    right.

17        "On July 26, 2011 and August 1, 2011, while an

18    inmate in the instant federal case, being housed at the

19    Cuyahoga County Jail, other female inmates reported to jail

12:20:26  20    staff that the defendant was recruiting them to work as

21    prostitutes for her once they were released from jail.

22    These other inmates were moved/separated from the defendant.

23        "On August 3, 2011, while an inmate in the instant

24    federal case, while housed at the Cuyahoga County Jail, the

12:20:46  25    defendant became upset at jail staff when she was told she

1       was being moved from one pod to another.

2              "She was banging her cell door with her crutches

3       and threatening to physically harm other female inmates.

4       Other female inmates who were pregnant verbalized they

12:21:02  5       feared the defendant because she had threatened to hurt

6       their unborn children."

7              That's pretty egregious conduct that's set forth

8       in the presentence report.  And I wonder if the defendant in

9       any way wishes to respond to that.

12:21:17 10            MR. BRYAN:  Your Honor, we have addressed with the

11      court, I believe, paragraph 75.  We filed an affidavit that

12      we secured from the individual who gave a 302 to the FBI

13      regarding those allegations in paragraph 75.

14             An individual by the name of Rachel Hamilton said

12:21:39 15      that she was detained at the Cuyahoga County Justice Center

16      in July 2011.  She was detained in the -- among these female

17      federal inmates.  Among these female inmates was Federal

18      Inmate Pearline Richardson.

19             "I was brought down to the detective bureau to

12:21:52 20      meet with two federal task force officers.  I did not

21      initiate this meeting.  I was shown a picture of Pearline

22      Richardson and asked if I knew her and what was going on in

23      the pod.

24             "I told these investigators that I personally did

12:22:04 25      not hear Pearline Richardson attempt to recruit women to

1    work for her prostitution business, but that the rumor --

2    but that that was the rumor going around the pod.

3           "I told them this was all secondhand information

4    shared with me by other female inmates who did not like

12:22:22  5    Pearline Richardson."

6           So we had an FBI 302 from this individual where it

7    states in the 302 where she said that Ms. Richardson was

8    recruiting people, but she told our -- actually, she told

9    Ms. Kucharski, when she located this individual, that she

12:22:36 10    told them just what the rumor was.

11           Part of the problem was that Ms. Richardson's

12    arrest was publicized by the local media.  In fact, I think

13    it was promoted, in essence, by the Public Affairs Office of

14    the U.S. Attorney's Office.  They now have a person who

12:22:53 15    works on behalf of the U.S. Attorney as a liaison with the

16    press.

17           And I believe even press conferences were held

18    regarding this.  And because of that, Ms. Richardson was the

19    target of a lot of the people in the jail saying, "You want

12:23:11 20    to recruit me," and that kind of thing.  And, quite frankly,

21    Ms. Richardson was just very upset because this is when she

22    was first arrested.

23           As it related to paragraph 74 -- oh, again,

24    Ms. Kucharski learned that all of the women who were making

12:23:37 25    allegations that Ms. Richardson was trying to recruit them

1  for prostitution actually were previously engaged in

2  prostitution themselves, and we recovered their arrest

3  records for prostitution and the like.

4      So Ms. Richardson, it's our position, was, in

12:23:54  5  essence, the victim of a rumor mill and a lot of harassment

6  because of the high-profile nature of her case, the fact

7  that it was publically -- it was in the news media.

8      THE COURT:  Let me tell you what I am concerned

9  about here.

12:24:09  10      It appears to me that Ms. Richardson has made

11  almost a life history out of being involved in prostitution.

12  Her only concern was the claim that she didn't know the girl

13  she was prostituting for was under 18.  But there's never

14  been an indication that she follows any other pursuit other

12:24:31  15  than prostitution.

16      MR. BRYAN:  I disagree with that, Your Honor.  I

17  think the record from the presentence investigation itself

18  and also the sentencing memorandum we filed reflects how and

19  when Ms. Richardson got involved in prostitution.

12:24:44  20      And I was prepared to address that as part of

21  my sentencing colloquy.

22      THE COURT:  I wish you would.

23      MR. BRYAN:  I just wanted to preserve the

24  substantial assistance issue on the record, and I've done

12:24:55  25  that.  But now I will turn my attention to the sentencing

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    issues as it relates to sentencing.

2         Obviously, 3553(a) is the controlling statute, and

3    it indicates that Your Honor is to take into consideration

4    the nature and circumstance the offense, which I am about to

12:25:15  5    discuss, and the history and characteristics of the

6    defendant to impose a sentence that's sufficient, but not

7    greater than necessary, to accomplish the purposes and goals

8    of sentencing.

9         Your Honor, as it relates to this offense conduct,

12:25:26  10    the genesis of this case was actually Ms. Richardson herself

11    contacting law enforcement when the minor in this case,

12    S.J., had stolen from her and went back to her home.  After

13    she was told she no longer wanted her to work with her in

14    her ring, the minor went back to Ms. Richardson's home, and

12:25:47  15    she wasn't there, and she stole a big screen television set.

16         And the neighbors reported to Ms. Richardson what

17    had happened, so Ms. Richardson actually contacted law

18    enforcement to tell them -- to report this burglary of her

19    home.  When law enforcement then approached the minor in

12:26:05  20    this case, there was also present the minor's mother and the

21    minor's -- who was identified as her brother -- Reggie, but

22    we learn later that she doesn't have a brother named Reggie.

23    So we're not sure who this other individual was.

24         But anyway, the individual, when the law

12:26:22  25    enforcement was talking to her about being -- having stolen

1      from Ms. Richardson, this individual named Reggie, and this

2      is all pursuant to the police reports in this case,

3      indicated to S.J., the minor, "You need to tell them about

4      the prostitution."

12:26:39  5          And so, in essence, the focus got flipped from the

6      minor being investigated for burglary to then the minor

7      telling them about the prostitution.

8          Now, the minor herself never admitted to being

9      involved in prostitution at that time, but said that

12:26:53 10    Ms. Richardson was running a prostitution ring, and then

11    later the minor did acknowledge that she was involved in the

12    prostitution.

13          What the evidence revealed is that this wasn't

14    something that Ms. Richardson had been doing all of her

12:27:06 15    life.  In fact, Ms. Richardson, the presentence

16    investigation report reflects from the time she was very

17    young, in fact, basically on her own as a teenager, and

18    growing up and living on her own and having her miscarriage

19    when she was 16 years old and then having her daughter who's

12:27:26 20    in court today when she was 16 years old, was working

21    fast-food restaurants, was working in the community, was

22    doing everything she could to try to survive in the

23    community working various odd jobs and staying away from the

24    criminal element.

12:27:41 25          And she continued to do that up until the

1    beginning of 2000 when she was involved in an automobile

2    accident that was alcohol related, and she was incarcerated

3    for that for aggravated vehicular assault.

4         And she was sentenced to prison and went to prison

12:27:56  5    for three years on that.  And also at the same time, there

6    was a RICO investigation, some sort of fraud activity, which

7    Ms. Richardson actually cooperated in, but she was

8    sentenced -- also a sentence to run concurrent with the time

9    that she was serving on that -- on the vehicular assault

12:28:17 10    case.

11         Ms. Richardson was released on that case, and in

12    2007, she came back to the community.  She was back with her

13    children, with her daughter, with her two sons, and she was

14    working legitimate jobs.  She was working at various places.

12:28:34 15    And the best job that she had was working as a telemarketer

16    selling AT&T products.

17         Unfortunately, there was something that happened

18    at AT&T, or not AT&T, but the telemarketer for whom she was

19    working, and she was let go.  I don't think she was fired.

12:28:52 20    She was laid off because of the downturn in the economy, and

21    she lost that employment.

22         After that, she started working at various night

23    clubs in the greater Cleveland area and she -- one of her

24    roles working at these night clubs was to organize dancers

12:29:10 25    and organize parties, like bachelor parties when men would

1    come in to have these bachelor parties, and there were

2    dancers at these night clubs that she would organize these

3    parties with.

4             And these were individuals that were just engaged

12:29:22    5    in dancing, exotic dancing, sometimes removing clothing and

6    things like that.  But they weren't engaged in prostitution

7    at that time.

8             It was while she was working in that capacity that

9    there were two dancers who enlightened her about this

12:29:40    10   Backpage USA, which is this online advertisement for -- you

11   never online, you don't advertise prostitution, but what is

12   advertised is massages, dances, things like that.  I think

13   the government would be the first to acknowledge that that's

14   basically just a front for prostitution, and that this is a

12:30:01    15   big problem nationwide, that literally, you know,

16   nationwide, thousands, if not tens of thousands of

17   individuals are engaged in advertising their services

18   through this Backpage.com.

19            In fact, it's a multibillion dollar enterprise

12:30:17    20   now.  This corporation has made tens of millions, if not

21   hundreds of millions of dollars, selling these

22   advertisements.  I think the government has a beef with

23   Backpage as well.  They know a lot of the people who

24   advertise may not be -- first of all, it's all illegal,

12:30:32    25   because prostitution is illegal in most states.  But it's

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    also not uncommon for minors to be involved in this as well.

2         So anyway, Ms. Richardson then learned how to do

3    this through a couple of dancers and she started with a

4    couple of other individuals she had met through the night

12:30:51  5    clubs who said they were interested in engaging in

6    prostitution in this manner.

7         And Ms. Richardson then gradually over time, in

8    essence, became like a manager of women who wanted to use

9    this service, this Backpage.com service, and she also then

12:31:08  10    started running prostitution out of her home.

11         Now, based upon our investigation, there were --

12    and this may seem to incriminate, but I think at the same

13    time, exculpatory, there were multiple women, I could

14    characterize even dozens of women who advertised with

12:31:32  15    Ms. Richardson through this Backpage.com, and based upon our

16    investigation, none of them were minors except for this

17    S.J., and that Ms. Richardson actually learned of S.J. when

18    she was in an after-hours club and S.J. was a dancer at this

19    after-hours club.  And this was part of the information that

12:31:51  20    she provided in her proffer to the FBI, that that's how she

21    first learned of her.

22         Now, S.J. clearly was a minor, but she's

23    physically developed.  She's post-pubescent.  She looks like

24    an adult.  In fact, out of the individuals that we

12:32:10  25    investigated in this matter, the adult individuals who were

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    involved, as well as S.J., she was clearly physically just

2    as mature as the other adults who were engaged in this

3    activity.

4           The bottom line is that if not for Ms. Richardson

12:32:33  5    reporting S.J. to law enforcement, it's very unlikely that

6    Ms. Richardson would have ever come to the attention of law

7    enforcement in this matter.

8           Now, it is important to note that as part of the

9    record, and this was in previous court filings, that S.J.

12:32:51  10    left a message with Ms. Richardson on her voice mail after

11    Ms. Richardson had reported her to the law enforcement, and

12    that message, I can't repeat it verbatim, in essence, is

13    what she said is, "You're a crass ole, dumb ole bitch."

14           THE COURT:  Threatened her?

12:33:10  15           MR. BRYAN:  "I'm a minor.  I'm a minor, and, you

16    know, you're going to be in trouble."  And then S.J.

17    obviously was cooperating with law enforcement against, and

18    had a stronger motive to cooperate with law enforcement

19    against Ms. Richardson, because Ms. Richardson had reported

12:33:27  20    her own criminal conduct to the police.

21           And it was S.J. who took law enforcement to see

22    one of the first other complainants in this case, a girl

23    identified as Sky, who then made a statement against

24    Ms. Richardson, and then other individuals.  One of the

12:33:46  25    individuals was there at the home when Ms. Richardson's

1    house was raided.  She's also someone who made a statement

2    against Ms. Richardson.

3            Now, I don't know if the government's arguing that

4    it's relevant conduct, that this counts as relevant conduct,

12:34:02  5    but I believe there were good fact-based reasons for the

6    government to dismiss those counts against the adults whom

7    the government allege --

8            THE COURT:  One of the things that troubles me is

9    the count that the government did not prosecute, and that's

12:34:13  10   the one dealing with the pornographic materials that she had

11   and she helped produce, as I understand, and that count was

12   the last count in the indictment, and that was dismissed.

13           I think that was a very serious count that is out

14   of the picture from the standpoint of sentencing, but it

12:34:34  15   certainly reflected very negative conduct on the part of

16   your client.

17           MR. BRYAN:  Well, the pictures -- and

18   Ms. Kucharski and I had an opportunity to view all the

19   images.  The pictures that were located, there was an issue

12:34:49  20   regarding who was the one who actually took the pictures.

21   They were not taken on a digital camera that was owned by

22   Ms. Richardson.

23           They were actually identified as taken on a

24   digital camera that was owned by one of the government's

12:35:02  25   witnesses in this case, a person identified Toni Walcott.

1   She was actually in the pictures as well.  She was in the

2   pictures along with S.J. and they were both -- they were

3   both clothed in some of -- in those images.  They were

4   actually engaged in suggestive poses with each other, but

12:35:25  5   they were wearing a negligee.

6        So the government's arguments related to

7   lascivious display -- now, Ms. Richardson never acknowledged

8   to taking those pictures or even telling them to pose or

9   anything like that, but those were images that were used and

12:35:44  10  created by that digital camera, but then were placed on the

11  computer that was found that Ms. -- that belonged to

12  Ms. Richardson.

13       Now, other images just were images that were used

14  on Backpage, as well, for advertisements, and the government

12:36:03  15  alleged that some of those were child pornography as well,

16  because, again, the lascivious display.  But although this

17  is a person who's chronologically a minor, physiologically,

18  for all intents and purposes, has the appearance of an

19  adult, or someone who could just as easily be 20 years old

12:36:22  20  or even older based upon her physiological appearance.

21       So I understand Your Honor's concern about that,

22  but I think there were fact-based reasons for the government

23  to be willing to dismiss that count as well.

24       The bottom line is, we're here today for the

12:36:37  25  underaged prostitution, and those cases vary greatly.  There

1    are cases where the defendants know that the person is a

2    minor at the time that they're using them in the

3    prostitution as compared to being reckless in that regard.

4           There are cases where the minor is even

12:36:54  5    prepubescent as compared to a post-pubescent minor.  There

6    are cases where the minor had been kidnapped and held

7    against her will or taken from one state to another or

8    brought from another country.

9           THE COURT:  Your point is this is not an egregious

12:37:11  10   case?

11          MR. BRYAN:  I would submit, as it relates to other

12   sex trafficking cases, this falls on the edge of promoting

13   prostitution, but getting into big trouble because one of

14   the prostitutes just happened to be a minor.

12:37:29  15          THE COURT:  You want to speak about your client

16   with respect to other matters?  I read carefully about

17   her historical background, and it appears to me that she

18   had, to put it mildly, a very difficult childhood.

19          MR. BRYAN:  Your Honor, I think that maybe one of

12:37:47  20   the -- I think the important dichotomies in this case is her

21   childhood appears to be very similar to the childhood that

22   the minor in this case is experiencing or was experiencing,

23   and I believe still is experiencing to this day.

24          She's someone who came from a broken home.  She

12:38:03  25   never knew her father.  Her mother abandoned her.  Her

                    Lori A. Callahan, RMR-CRR      (330) 252-6022

1    grandmother did everything she could to try to raise her,

2    but unfortunately, there were lots of other children that

3    the grandmother was trying to raise at the same time.  You

4    know, she was a victim of her upbringing and her poverty.

12:38:20  5    She did suffer sexual abuse as a minor, as a young child at

6    the hands of one of her mother's boyfriends.  She also

7    reported being sexually assaulted as an adult as well.

8         All along, her main goal in life, especially after

9    her children were born, was to try to provide for her

12:38:38  10    children in the manner in which she wasn't.

11         THE COURT:  She has three children?

12         MR. BRYAN:  She has three children.  All three are

13    present in the courtroom today, the oldest being 23 and her

14    youngest son, Requan, who's 15, and her other son who's 20.

12:39:00  15         THE COURT:  I appreciate the family appearing.

16         MR. BRYAN:  And I think it's also important to

17    note as it relates to the victim in this case is that she

18    wasn't being held against her will.  She was able to come

19    and go.  She did come and go.  She left.

12:39:15  20         She was there -- in fact, we had a lot of evidence

21    that she contacted Ms. Richardson and continued to contact

22    her.  When Ms. Richardson left town and was visiting her

23    daughter in Florida, she was contacting Ms. Richardson

24    because she wanted to work, things of that nature.

12:39:31  25         And I think all those things mitigate against the

Lori A. Callahan, RMR-CRR      (330) 252-6022

1       type of sex trafficking case when you think of even

2       President Obama, in front of the Clinton Global Initiative

3       spend an entire speech before the Clinton Global Initiative,

4       talking about how his administration has been working hard

12:39:48  5   against human slavey, especially as it relates to sex

6       trafficking, even here in the United States.

7               And so there is a big -- there is a big push to

8       address these concerns, and what I am suggesting is that

9       this case doesn't represent the most aggravated case of sex

12:40:07  10  trafficking.  In fact, if S.J. was an adult, there wouldn't

11      be a federal case.

12              This would be a case where Ms. Richardson would be

13      looking at promoting prostitution, because prostitution is

14      illegal in the state of Ohio.

12:40:20  15           It also would be a case that if they were in

16      Nevada, she would have to make sure that she was properly

17      licensed and that the health department was coming in to

18      make sure that she was running her legal prostitution

19      brothel appropriately.

12:40:37  20           So there's a nationwide -- I mean, there's sort of

21      a schizophrenic approach to these vice crimes that make it

22      difficult for me, as a defense attorney, to say that

23      Ms. Richardson should be looking at a mandatory minimum of

24      ten years in prison, when but for, you know, a different set

12:40:56  25  of circumstances, she may actually be able to engage in this

1    same behavior legally, not with the minor, of course, but

2    the overall behavior legally in other states, and she's

3    properly licensed and the like.

4            So, again, 120 months is a significant sentence.

12:41:14  5    I think it's much greater than necessary to accomplish the

6    purposes and goals of sentencing as it relates to

7    Ms. Richardson.  I did hope for her that we would have the

8    opportunity to even go below that based upon her

9    cooperation.  I still have hope that the government will at

12:41:31 10    some time within the --

11            THE COURT:  The government always has the power to

12    make -- I think it's a Rule 35 motion.

13            MR. BRYAN:  Within a year.

14            THE COURT:  But the court doesn't have any

12:41:41 15    control.

16            MR. BRYAN:  We understand.

17            THE COURT:  I hope the people realize that we have

18    what we call a separation of powers in this country, and the

19    court does not control the executive branch of the

12:41:51 20    government, and it's the executive branch of the government

21    that has to decide what it wishes to do, A, with the

22    question whether there was substantial assistance; and, B,

23    whether or not to file a Rule 35 motion.  I don't have any

24    control over that.

12:42:04 25            MR. BRYAN:  We understand, Your Honor, and I've

1    explained that to Ms. Richardson as well.  That doesn't

2    minimize her disappointment regarding that and her --

3            THE COURT:  In any event, maybe to summarize, you

4    believe based on the background of the defendant, her

12:42:22   5    difficult upbringing, the fact that she's, from all

6    accounts, been an excellent mother, and also the rather

7    unusual way in which this criminal offense was discovered,

8    all of which in your view is warranted for a downward

9    variance?

12:42:43  10            MR. BRYAN:  It is, Your Honor.

11            THE COURT:  I appreciate how hard you've worked

12    for your client, and I will give the government the

13    opportunity to respond on the issue of variance.

14            MR. SULLIVAN:  Thank you, Judge.

12:42:53  15            First, I guess I am just going to go in order, I

16    want to address Mr. Bryan's comments regarding the refusal

17    of the government to make the 5K motion, and I think I wrote

18    it down.  I don't know.

19            THE COURT:  Let me say, first of all, you don't

12:43:10  20    have to justify that, that's --

21            MR. SULLIVAN:  Well, I now, but he actually made

22    the comment that he's not sure that he can show improper

23    motive, and I want to invite him that if he thinks he has a

24    shred of evidence of an improper motive, to bring it on,

12:43:21  25    because there's none.  There's none.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1          She didn't give anything.  She didn't do any

2     substantial assistance.  She gave dated information of stuff

3     that the FBI already knew, and she tried to flip in somebody

4     else she knew that was engaged in tax fraud.  It's -- okay.

12:43:34  5     It's a lead.  That's not 5K.  It's a lead.

6          This is a person who's committing illegal

7     activity.  They're going to refer to the right agency to

8     look into it.  It wasn't given enough time to look into

9     anything, and it wasn't substantial.  It's an identification

12:43:45  10    of someone who might be engaging in fraud.

11         So to say that he's not sure that he can show it's

12    an improper motive is despicable.  He knows he cannot show

13    improper motive.  She didn't do substantial assistance.

14         Moving on.

12:43:57  15         As far as the -- whether or not she recruited

16    somebody in jail, I know they got a statement from some

17    other inmate who said, "Oh, what I said before to the FBI

18    isn't true."  Okay.

19         But there were two other ones who gave statements

12:44:09  20    to the FBI that she was trying to recruit in jail.  So as

21    far as this statement in paragraph 75, the government stands

22    by it and says -- we still say that the evidence supports

23    that she was trying to recruit other women in the jail to

24    engage in prostitution.

12:44:21  25         As far as the photos that you indicated you had a

1    concern about the charge that was going to be dismissed

2    regarding production of child pornography, and it's almost

3    comical, Mr. Bryan said that he's not sure who took the

4    photos because there was another person involved.  But then

12:44:39  5    he admits that the other person involved was actually

6    depicted in the photos with the minor engaged in sexual

7    activity.

8         Well, that would leave one person taking the

9    photo.  It was Ms. Richardson.  That's what both of those

12:44:48  10    other two people said happened, and that's what the evidence

11    would show happened since two of them are in the photo, the

12    third person would be the photographer.  That's really not a

13    stretch.

14         And since we're talking about preponderance of the

12:44:58  15    evidence, we think it certainly makes that a preponderance

16    of the evidence.

17         As far as whether or not we consider the other

18    acts relevant conduct, we do.  And, again, there were

19    several reasons, obviously, that went beyond why this case

12:45:10  20    worked out in a plea, and it certainly was going to be --

21    there's no doubt that there were going to be some

22    credibility issues with some of the witnesses or the

23    victims, and the government is cognizant of that, and it

24    resulted in plea negotiations.

12:45:22  25         But that's -- but that calculus is determining

1  whether or not we think we can prove a case beyond a

2  reasonable doubt.  We're at sentencing now.  It's beyond

3  preponderance of the evidence.

4  So we fully assert to the court that the facts

12:45:36  5  contained that support those counts is certainly relevant

6  conduct and this court can consider it.  We certainly

7  believe that there's preponderance of the evidence that she

8  engaged in the activity that lead to those counts.

9  Now, there's reasonable cause.  There was -- she

12:45:48  10  was indicted for it.  We certainly think there was

11  preponderance of the evidence to show that she did engage in

12  coercion, she did engage in intimidation.

13  So this case, while I understand that they

14  submitted a lengthy sentencing memorandum, the boo-hooing

12:46:02  15  about Ms. Richardson's past, but it's somewhat ironic that

16  they said because she had such a troubled childhood, it's

17  okay that she exploit another child and was going to lead

18  her down the very same path that she now is trying to use as

19  an excuse.

12:46:13  20  But other than that, the fact is, these other

21  counts support the fact that it wasn't just that the child

22  was a minor.  We think there's a preponderance of the

23  evidence she was engaged in intimidation.  She was engaging

24  in coercion.  This was not entirely voluntary on the part of

12:46:27  25  these other women and on the part of the minor.  And there

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    was evidence that she engaged in physical violence.  She

2    engaged in threats.

3            She engaged in -- there's evidence -- and they're

4    well aware of it, there's evidence of a recording of her

12:46:39  5    going on, yelling and screaming in quite a violent nature.

6    There's certainly evidence that she engaged in intimidation

7    and violence.  We think that goes to, in part, the

8    balancing.

9            Again, we understand the unfortunate situation she

12:46:51  10   may have had growing up might be -- when the court is trying

11   to balance reasons for a variance, that might be one part.

12   But the other side is also the egregiousness of this

13   conduct, and it is egregious.  It might not be someone who

14   was kidnapped, and Mr. Bryan can list a variety of cases

12:47:06  15   that could be worse, but it's not the most mild either.

16           We have evidence that -- first of all, admittedly,

17   that she was prostituting a minor, and then the

18   preponderance of the evidence, we would submit, is for the

19   relevant conduct of the other counts that showed she was

12:47:21  20   engaging in intimidation and violence with these -- or

21   coercion with these other women.

22            So we don't think a variance is supported at all.

23            Mr. Bryan makes a comment about, you know, if it

24   wasn't -- whatever, if we were in Nevada; well, it makes no

12:47:38  25   sense.  We're in Ohio.  We're in the Northern District of

Lori A. Callahan, RMR-CRR       (330) 252-6022

1    Ohio, and the child was a minor.  So to say that -- what did

2    he say?  Chronologically, she is a minor, but

3    physiologically --

4            THE COURT:  "Schizophrenic" was the word about

12:47:52  5    this country with respect to prostitution.

6            MR. SULLIVAN:  What was it?

7            THE COURT:  Schizophrenic.

8            MR. SULLIVAN:  He was promoting the fact that the

9    child physiologically didn't look like a minor, but

12:48:03 10    chronologically she was.

11            I think, having been a prosecutor for 24 years, I

12    am pretty sure that would be the purpose behind crimes that

13    have statutes of ages of consent, because children

14    physiologically may develop quicker than they do mentally,

12:48:18 15    so there's purposes in why we pass these laws, and that's

16    why we're here for things such as we are.

17            Judge, in sum, this case obviously was a

18    contentious case throughout, and the defendant is getting --

19    did get quite a benefit from this plea.  She was facing

12:48:35 20    15-year minimum mandatories on all the counts alleged before

21    us, as well as the alleged count of production of child

22    pornography.

23            And she's now facing a ten-year minimum mandatory.

24    She's got a quite a benefit in this case, and we don't think

12:48:46 25    there's any reason -- and keeping in mind the lengthy

1    defense sentencing memorandum, when balanced against the

2    relevant conduct in this case and everything else about

3    Ms. Richardson, we don't think there's any reason to vary

4    downward and we would ask you not to vary downward.

12:49:02    5         THE COURT:  Response?

6         MR. BRYAN:  Yes, Your Honor.

7         First, as it relates to chronologically versus

8    physiologically, I think I should have added behaviorally as

9    well, because our investigation revealed that S.J. was going

12:49:14   10    to night clubs and drinking in bars and smoking cigarettes

11    and going and purchasing cigarettes, which you have to be 18

12    to do in any convenient store all around, engaging in

13    drug-related activity, selling drugs.

14         Ms. Richardson first met her when she was acting

12:49:32   15    as an exotic dancer in an after-hours club that she was

16    engaged in sex acts in public at an after-hours club,

17    involving things that not only with someone who appeared to

18    be an adult, but was acting like an adult.

19         So there's a chronological age that comes into

12:49:55   20    play here, and there's a physiologically agent, behavioral

21    agent, when someone is acting like an adult and they look

22    like an adult and when you're in that part of society where

23    you're at an after-hours club, and there's alcohol and

24    there's drug abuse and sex acts going on in front of lots of

12:50:09   25    people, if you're in that environment, too, admittedly

1    Ms. Richardson was, it may be easy to believe that the

2    person is a consenting adult.

3           Now, the reason she admitted to being reckless in

4    this case is, quite frankly, prostitution is risky business.

12:50:27  5    And if you're going to promote it and you're going to

6    involve other people in it or allow other people -- allow

7    yourself to be used in it by assisting other people to be

8    involved in prostitution, then you need to dot all of your

9    I's, cross all your T's, be as vigilant as you can to make

12:50:44  10   sure that the persons whom you are using are of an

11   appropriate age to be able to consent to the activity that

12   they're engaging in.

13          That's the theory upon which Ms. Richardson

14   admitted her guilt in this case, and that's the appropriate

12:50:59  15   theory that we had to face if we went to trial, because the

16   government doesn't have to prove knowledge.

17          If the government has its way and Congress, if it

18   gets the laws passed exactly the way they want them passed,

19   and there's not only a lack -- they don't have to prove

12:51:14  20   actual knowledge, they just have to prove for recklessness.

21          And what the heck is recklessness?  So that was

22   the fear that we had going to trial against a count where

23   the government didn't have to prove actual knowledge.

24          As it related to the child pornography case, they

12:51:31  25   didn't have to prove actual knowledge that the child was

1    under the age of 18 to be able to subject her to a mandatory

2    minimum of a 15-year prison sentence, and there weren't just

3    three people that day.  In fact, there were images of other

4    people that were sitting on the couch.

12:51:49    5         Our investigation revealed that there were six

6    individuals there that day, not just three.  There were

7    other individuals there.  There were other individuals who

8    could have taken the pictures upon which the government

9    wanted to rely.

12:52:02   10         The bottom line is, Your Honor, this case gives us

11   a view into a very sordid and sad world, an extremely sordid

12   and sad world.  And, quite frankly, it was a world that

13   Ms. Richardson was born into as it relates to the

14   presentence investigation report and the psychological

12:52:22   15   evaluation.

16        This is the world she grew up in.  This is the

17   world that she was exposed to.  But even being exposed to

18   such a negative world, Ms. Richardson still strived to live

19   a law-abiding life, and even after going to prison for an

12:52:38   20   auto accident where alcohol was involved, she still strived

21   to live a law-abiding life.

22        And it was only after a downturn in the economy

23   where she lost her law-abiding job and she started working

24   in this other area working in the red light district as it

12:52:54   25   relates to night clubs and exotic dancers and things like

1    this, that she then got involved in this other very terrible

2    and sad part of life.

3         It's a life that exists, Your Honor, that most of

4    us aren't exposed to within federal courthouses, but even

12:53:13    5    legitimate pornography, if there is such a term, even lawful

6    pornography is a multibillion dollar business.  Sex sells in

7    this country.  It sells whether it's being done legally or

8    whether it's being done illegally.  It sells and people use

9    it to benefit themselves financially.

12:53:33   10         Ms. Richardson has admitted to doing that herself.

11   But this is not the case of a prepubescent-known minor being

12   taken against her will and being forced into prostitution

13   from another country.  This is that borderline case where

14   physiologically, emotionally, behaviorally, this young lady

12:53:56   15   appeared to be as much as an adult as the other individuals

16   who were engaged in this conduct with Ms. Richardson who

17   were not the subject matter of this case, even the earlier

18   case where there was an indictment.  There are many other

19   individuals known to the government who were not alleged to

12:54:12   20   have been forced into this activity.

21        In fact, individuals who admitted to us that they

22   were involved in this, but they were never forced.  It was,

23   you know, if you wanted to earn some money, you call, you

24   come over, you do a few appointments, you have the money

12:54:27   25   that you earn and you leave.  Nobody was held against their

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    will, even by a preponderance of the evidence.

2            So this is a case that, I think, warrants

3    mitigation.  It warrants statutorily a sentence that's

4    sufficient, but not greater than necessary.  I believe the

12:54:44  5    statutory mandatory minimum is greater than necessary.  We

6    don't have a vehicle to go below it.

7            And I would also submit that, based upon what I

8    observed, and based upon what the agents told me and based

9    upon what Ms. Kucharski observed during the proffer, Ms.

12:55:01  10   Richardson was forthright.  She was honest about all the

11   information she provided, that she provided leads to the

12   government.  I've sat through dozens of proffers throughout

13   my career where the government has received less and still

14   made the motion for substantial assistance.

12:55:16  15           As far as an improper motive not to seek it, I

16   think the motive on the government's part is this:  They

17   don't want to seek a variance on be- -- seek the motion on

18   behalf of Ms. Richardson because they fear that this court

19   will take advantage of that motion and sentence her to a

12:55:34  20   sentence that is far less than 120 months, and they don't

21   want to take that risk.

22           I think that's an improper motive, and I will

23   place it on the record.

24           THE COURT:  Thank you.  The court will publish an

12:55:52  25   opinion, and I'm not going to take the time to read the

1    entire opinion.

2          But the court has concluded that a downward

3    departure of two levels is justified, so that changes the

4    sentencing range.  It was previously 151 to 188 months.  The

12:56:13  5    new sentencing range is 121 to 151 months.

6          And before I decide what the sentence would be, I

7    will give counsel an opportunity to argue, and also, of

8    course, Ms. Richardson has the opportunity to speak to the

9    court as she so wishes.

12:56:30  10          Does the government have anything they wish to add

11    with respect to the sentencing between the range of 121 to

12    151 months?

13          MR. SULLIVAN:  Judge, for the reasons stated

14    before, the government feels that a sentence at the high end

12:56:44  15    of the range you have now set would be the only sentence

16    justified in this case.

17          THE COURT:  Thank you.

18          Counselor, do you want to speak first, or do you

19    want your client to speak first?

12:56:53  20          MR. BRYAN:  Your Honor, I will allow

21    Ms. Richardson to have the -- I will let her speak first.

22          THE COURT:  Ms. Richardson, the law provides that

23    before the court sentences a defendant, the defendant has a

24    right to speak to the court, not required to, but you

12:57:09  25    have -- you have the right to speak to the court and address

Lori A. Callahan, RMR-CRR     (330) 252-6022

```
            1    the question of how I should use my discretion in this

            2    matter.

            3              And if you wish to speak, I am prepared to listen

            4    to you.

12:57:28    5              You can remain seated.  I think it would be easier

            6    to pick you up on the mic.  I appreciate the fact that you

            7    were prepared to stand, but you can remain seated.

            8              THE DEFENDANT:  Thank you.  I want to apologize to

            9    S.J. because I did not know that she was a minor.  And I

12:57:55   10    guess I should apologize to the State of Ohio for trying to

           11    pay bills.  I never hurt anyone doing what I was doing.

           12    Girls even called on a daily basis for me to get work for

           13    them.  Because we -- you know, we had downtime.

           14              I didn't do this for no more than 13 months, and

12:58:25   15    that's not even a 13-month-straight thing, because it was

           16    like 30, 45, 60 days where we will go and don't even get

           17    appointments.

           18              Everything was 50/50.  No one was forced.  We got

           19    along.  We never got hurt by anyone.  Not no appointments,

12:58:49   20    no one got hurt.

           21              I guess -- and S.J., she was young, and I didn't

           22    know even -- I didn't even know -- believe it until after I

           23    was arrested and in custody.  She left me the message.  I

           24    didn't believe it then.  I mean, the attorney that I had

12:59:15   25    before these attorneys, she was telling me, and I'm like,
```

1    there's no way, you know, because I've been around this

2    girl.  I'm here because I misjudged her.  I didn't know, and

3    that was part of my job, was to know.  I wouldn't put a

4    child in a situation like that.

12:59:34  5         I need to apologize to my family and my son.  I

6    need to apologize to my son, Requan, because I'm a mother,

7    I'm a mother, and I'm a good mother.  And I wouldn't -- I

8    mean, I wouldn't -- I wouldn't do this to no child.  I've

9    been there.  You know, it's crazy.  Like this stuff is like

13:00:15  10   a bad dream, all these people I'm meeting, my lawyers, the

11   prosecutor, FBI agents, and this is like TV stuff.

12        You know, I don't want to be the bad guy here.

13   All I wanted to do was like, you know, pay my rent, get a

14   landlord.  I don't have nobody else to go live with.  I got

13:00:42  15   to have a place for me and my son to live, put food on the

16   table, keep the light and the gas bill on.

17        I mean, this girl that I met, and it was terrible

18   that I met her, so terrible, because like she told -- she

19   say, "Look, I'm doing this and how I'm working here now, so,

13:01:14  20   you know, I heard about what you do.  A lot of people talk

21   about you all the time, the girls you work for, they looking

22   nice, they driving nice, they eating good.  I get cheated

23   out of my money here.  I don't even get my money here."

24        She approached me more than twice to work for me,

13:01:35  25   and I wished I would never, ever worked with this girl.

1    Because I wouldn't do that.  I wouldn't.  That's not my

2    thing.

3            You know, I was just looking forward to being like

4    a grandmother.  I was so happy that my daughter's life was

13:01:57  5    taking off so beautifully and she getting married,

6    getting -- about to be a grandmother, because this is

7    different and I experienced a different feeling from being a

8    mother to a grandmother.  I just wanted to, whatever

9    mistakes that I made being a mother, I learned, so I can be

13:02:18 10    a better grandmother.  And that's all I wanted to do, is be

11    close to my children and be there for them as a mother and

12    make up for them three years that I did mess up.

13            This agent -- I mean, this prosecutor, he feels

14    like there's no other underaged kid, you know.  I was trying

13:02:52 15    to be careful and keep us all safe.  All we wanted to do was

16    pay our bills.  This is what we did, and it was wrong, but

17    we did it.  I mean, I tried to -- I wasn't making millions,

18    not even thousands.  I was just making enough to pay the

19    bills, because I couldn't get a job, and I tried to get a

13:03:18 20    job.  I love working a 9:00 to 5:00.  I would love to.

21            I never forced anyone to do this.  No one.  I feel

22    like -- hey, I am 40-something years old, you know.  Ten

23    years to me is life.  Anything is life.  I mean, I just got

24    myself together right way with my kids.  I got myself good

13:03:50 25    with my kids.  You know, they all -- they staying in school,

1    and I made sure of that.  I made sure that they know how to

2    take care of themselves and understand what's going on out

3    here, and my children don't get in trouble.  I kept a tight

4    end on them before the three years in prison and after the

13:04:13  5    three years.

6         I just -- I wasn't -- I was just trying to be a

7    mother.  S.J. girl, she was around my son.  You know,

8    there's no -- I know now that she was underage.  I know that

9    now, but I keep thinking back, like how the hell did I miss

13:04:37 10    it?  How did I miss it?  Because I didn't know, and that's

11    why I am in trouble right now.  And I got to be tooken away

12    from my kids and my granddaughter, and to see my daughter as

13    a wife.  And my grandmother is 90-some years old; my aunt.

14    This is all that I have.  I don't have anything else.  I

13:05:04 15    didn't go out and rob anyone, shoot or kill.  They said I

16    had a gun.  Never had a gun.  I don't even like

17    firecrackers.

18         So just the nature of this case, it makes it so,

19    like, huge worldwide, because it was a minor involved.  It

13:05:23 20    ain't even about the prostitution, because it's about just a

21    minor being involved and just being in grown-up places and

22    stuff.

23         And I was there with her, not knowing that she was

24    a minor, and it's costing me so much, and I feel like -- I

13:05:45 25    mean, I feel like really, really bad that I did not know,

1    Your Honor.  I feel so terrible that I did not know about

2    S.J.'s age.

3            And I never did any harm to her.  Looking at her

4    as an adult, I never put my hands on her.  I never

13:06:10  5    disrespected her.  I never did anything to her.  This is

6    brought about because I smelled like chemicals coming out of

7    her body, which is what they call wet PCP.  I felt no longer

8    to work with her anymore, because she wasn't right.  She was

9    doing drugs.  I didn't want to work with her no more.

13:06:32  10           And this was before July 4th of 2011.  She was

11   smoking water.  I don't want to work with nobody that's

12   doing stuff like that, because it brings other problems, and

13   I don't do drugs like that.  I fired her.  I said -- I told

14   her, I was like, "I don't think we could work together

13:06:57  15   anymore."

16           And during like a week after that, she broke into

17   my house because she knew that I wouldn't be there at that

18   time.  She knew that my son would be with his dad.  She

19   broke into my house.  As soon as I pulled on the street,

13:07:13  20   like three neighbors of mine run out of their homes saying,

21   "Hey, that girl just with a truck and two guys and a girl,

22   they just like -- they just was banging on your door real

23   hard, and they took something out your house and ran down

24   the street -- she drove off down the street."  It's a

13:07:32  25   one-way street.  She did it in broad daylight for all the

1    neighbors to see.

2         And I just called the police right away.  If I am

3    doing something like this with a minor, I mean, why would I

4    call -- why would I call the police on her?  I didn't know

13:07:50  5    she was a minor.

6         But even still, everything still falls back to me

7    being -- trying to go make money without having the rights

8    to run a business.  All I was thinking about, paying the

9    light bill and the gas bill and food on the table; and my

13:08:15  10   son, he's 14, 13.  This guy wore a size 12 in shoes, in

11   shoes.  I mean, he played foodball.  That's -- you know, I

12   have to just try to keep a good -- keep him right and out of

13   trouble.

14        Because if my child was somewhere out there

13:08:35  15   doing -- and if my child was somewhere and I ain't even know

16   where my kid was, I would go find my child.  I will find my

17   child and know what's going on with my child.  No matter --

18   I wouldn't go -- I wouldn't even get no sleep.  I got to

19   know where my child is.

13:08:57  20        I don't even know how I -- I got wrapped up -- I

21   don't know how I didn't see that this girl was underaged,

22   because this is a nightmare for me that's going to haunt me.

23   And I am sorry to her, because I wouldn't have never

24   involved her in anything if I didn't know she was -- I

13:09:19  25   thought she was an adult.  I would have never take a child

1    and do something like that.

2            I met her, and I am going to say it, I met her in

3    an after-hours spot sucking a man's dick in a dick sucking

4    contest.  That's how I met her.  So how am I -- I thought

13:09:41  5    she was bad business from that point on, because after the

6    contest, knowing that she working for this Tokyo person at

7    his house three streets from my house, she comes and asks me

8    to work for me being disrespectful to him.  That could cause

9    problems for me again.

13:10:02  10           And that was the first time I ignored her, and I

11    wished I would have just kept ignoring her.  And she looked

12    different each and every time you see her.  She looks

13    different.

14           THE COURT:  Thank you for your statement.

13:10:19  15           It will be the sentence of this court that you be

16    committed to the Bureau of Prisons for a period of 132

17    months.

18           That you be on supervised release upon release

19    from imprisonment for a term of five years.

13:10:40  20           You shall pay a special assessment to the United

21    States of $100, which shall be due immediately.

22           While on supervision, the defendant shall not

23    commit another federal, state or local crime, shall not

24    illegally possess a controlled substance, shall comply with

13:10:54  25    the standard conditions that have been adopted by this court

1    and shall comply with the following additional conditions:

2         Mandatory drug testing.  The defendant shall

3    refrain from any unlawful use of a controlled substance and

4    submit to one drug test within 15 days of the commencement

13:11:08  5    of supervision, and to at least two periodic drug tests

6    thereafter determined by the pretrial services and probation

7    officer.

8         Firearms and dangerous weapons.  The defendant

9    shall not possess a firearm, destructive device or any

13:11:21  10    dangerous weapon.

11         Search and seizure.  The defendant shall submit

12    her person, residence, computer or vehicle to a warrantless

13    search conducted and controlled by the United States

14    Probation Officer at a reasonable time and in a reasonable

13:11:33  15    manner based upon reasonable suspicion of contraband or

16    evidence of a violation of a condition of release.  Failure

17    to submit to a search may be grounds for revocation.

18         The defendant shall inform any other residents

19    that the purposes -- that the premises may be subject to a

13:11:47  20    search pursuant to this condition.

21         Financial disclosure.  The defendant shall provide

22    the probation officer with access to any requested financial

23    information.

24         Financial restrictions.  The defendant shall not

13:12:00  25    incur now credit charges or open additional lines of credit

1    without the approval of a probation officer.

2         Drug treatment and testing.  The defendant shall

3    participate in an approved program of outpatient, inpatient

4    or detoxification substance abuse treatment, which will

13:12:16    5    include drug and alcohol testing to determine if the

6    defendant has reverted to substance abuse.

7         Sex Offender Registration Notification Act (Adam

8    Walsh Act).  Pursuant to 18, United States Code, Section

9    3583, the defendant is required to register under the Sex

13:12:31    10    Offender Registration Notification Act and must comply with

11    the requirements of that act as directed by the probation

12    officer.

13         Pursuant to the Adam Walsh Child Protection Act of

14    2006, the defendant shall register as a sexual offender not

13:12:46    15    less than three business days from her release from custody.

16    The defendant will keep the registration current in each

17    jurisdiction in which she resides, is employed or is a

18    student.

19         The defendant shall, no later than three business

13:12:58    20    days after each change in name, residence and employment or

21    student status, appear in person to at least one

22    jurisdiction in which she is registered and inform the

23    jurisdiction of all changes and reporting information.

24         Failure to do so may be a violation of her

13:13:13    25    condition of supervised release and may be a new federal

1    offense punishable by up to ten years.

2         Mental health treatment.  The defendant shall

3    participate in an outpatient mental health treatment program

4    as directed by the probation officer.

13:13:34  5         DNA collection.  The defendant shall cooperate in

6    the collection of DNA as directed by the probation officer.

7         Minor Protection and Restriction Program.

8    Defendant will abide by all rules of the Minor Protection

9    and Restriction Program of the United States Pretrial

13:14:01  10   Services and Probation Office.

11        Defendant shall submit to a mental health

12   evaluation and sex offender assessment as directed by the

13   probation officer.

14        Defendant shall participate in any treatment

13:14:12  15   program, including for sexual deviancy, which may include

16   polygraph testing recommended by these evaluations.

17        The defendant shall submit to periodic polygraph

18   testing as directed by the probation officer.  No violation

19   proceedings will be based solely upon the results of the

13:14:28  20   polygraph examination or a valid Fifth Amendment refusal to

21   answer a polygraph question.

22        The defendant shall not have any contact with the

23   victim or victim's family, including letters, communication

24   devices, audio or visual devices, business or any contact

13:14:44  25   through a third party without prior written consent of the

Lori A. Callahan, RMR-CRR     (330) 252-6022

 1    probation officer.

 2            The defendant will not possess any type of camera,

 3    photograph device and/or equipment, including video

 4    recording equipment, without the written approval of the

13:14:58 5    probation officer.

 6            The defendant should understand that if you wish

 7    to appeal your conviction and sentence, you must file a

 8    notice of appeal within ten days.

 9            Do you understand?

13:15:15 10            THE DEFENDANT:  Yes, and I will.

11            THE COURT:  Is there anything further that the

12    court should consider in this sentencing?

13            MR. SULLIVAN:  Judge, just the only other item was

14    in paragraph 22 of the plea agreement, that the defendant

13:15:24 15    had agreed to the forfeiture of $3,000.  We would ask you to

16    order that.

17            And also, the United States would move to dismiss

18    Counts 2 through 7.

19            THE COURT:  The forfeiture of $3,000 will be

13:15:36 20    ordered as involved -- is that in the plea agreement?

21            MR. BRYAN:  It is, Your Honor.

22            THE COURT:  And the other charges will be

23    dismissed.

24            MR. SULLIVAN:  If we could ask, Judge, there's

13:15:51 25    computer equipment and stuff with contraband on it, just ask

1          for an order for that to be destroyed by the FBI.

2                    THE COURT:  Yeah.  Give me a written order, if you

3          would.

4                    MR. SULLIVAN:  Thank you, Judge.

13:16:01  5          THE COURT:  Does the defendant have a place where

6          she prefer the court to recommend for incarceration?

7                    MR. BRYAN:  Yes, Your Honor.  Two of her children

8          now reside in Florida.  We would ask that Your Honor

9          recommend that the nearest available facility to northern

13:16:18  10         Florida.  I believe it's Jacksonville, Florida.

11                   THE COURT:  The court will make that

12         recommendation.  Is there a backup recommendation?  Because

13         they don't necessarily follow what I recommend.

14                   MR. BRYAN:  Then the nearest to the Northern

13:16:31  15        District of Ohio, because that's where the rest of her

16         family is.

17                   THE COURT:  All right.

18                   MR. BRYAN:  So either Ohio or Florida.

19                   THE COURT:  We will do that.

13:16:35  20        MR. BRYAN:  We would ask for credit for time since

21         July 14, which was the date of her arrest.

22                   THE COURT:  Credit will be provided with respect

23         to the sentence for that time she's been in custody.

24                   Anything further to come before the court?

13:16:52  25        MR. BRYAN:  Apparently, the PSR says that she was

                         Lori A. Callahan, RMR-CRR        (330) 252-6022

1    arrested on the 18th, but that was when she was first in

2    federal custody, but she was arrested on this case on the

3    14th.

4            THE COURT:  The 14th of --

13:17:05  5            MR. BRYAN:  July, 2011.

6            THE COURT:  So she's been in custody for well over

7    a year then.

8            MR. BRYAN:  Right, Your Honor.

9            THE COURT:  And also that PSR amendment reflected

13:17:14 10    that date as well.

11            If Mr. Riffle --

12            MR. SULLIVAN:  Judge, I'm not sure if you can give

13    credit for state time.  I mean, if it was original --

14            THE COURT:  She doesn't get credit until she's in

13:17:24 15    federal custody.  When did she come into federal custody?

16            MR. BRYAN:  I believe on the 18th is when she had

17    her first appearance.  But she was arrested on the 14th by

18    the federal agents.

19            THE COURT:  We will make it the 14th of July, you

13:17:37 20    say, 2011?

21            MR. BRYAN:  Yes.

22            THE COURT:  That's a lot of time to be credited

23    for.

24            Anything further?

13:17:45 25            MR. SULLIVAN:  It's a difference of four days,

1    Your Honor.  It's the 18th or the 14th.  She was arrested

2    locally, and she was charged federally on the 18th.

3            For purposes of appeal, I don't think that you can

4    give credit for --

13:17:57 5            THE COURT:  That's true.  She didn't come into

6    federal custody until the 18th of July.  That's when she

7    will be given credit for that time.

8            MR. BRYAN:  Only, she didn't -- wasn't subjected

9    to a state sentence.  I mean, she ultimately --

13:18:10 10           THE COURT:  It still starts when you're in federal

11   custody.  You can't get credit for time in state custody.  I

12   can't do anything about that.

13           As a matter of fact, if I say otherwise, the

14   Bureau of Prisons will overrule me anyway, so there's no

13:18:25 15   sense in getting an incorrect order.

16           Anything further?

17           MR. BRYAN:  Just that, I guess, the four days

18   could be taken into consideration as part of your sentence,

19   Your Honor, instead of 132, but we don't sentence people to

13:18:46 20   days, we sentence people to months.

21           THE COURT:  Yeah.  I can't modify the sentence by

22   that.

23           Now, I would assume that Ms. Richardson wishes to

24   file a notice of appeal.  She filed a lengthy pro se written

13:19:05 25   document that I think I have described earlier when she

1    asked to withdraw her guilty plea, at least I read it to be

2    that.  And I also understood she asked me for new counsel,

3    both of which I overruled.

4         And, Ms. Richardson, I have to tell you, I don't

13:19:23  5    know how you could have gotten two lawyers that worked

6    harder for you than these two, but counsel may wish that I

7    appoint someone else to represent her on appeal.  I think

8    that might be appropriate.

9         MR. BRYAN:  Your Honor, we will file the notice of

13:19:36  10   appeal, and then we will indicate in the notice whether or

11   not other counsel should be assigned.

12        THE COURT:  Very well.  I will leave that to you.

13   Anything further?

14        MR. SULLIVAN:  No, thank you, Judge.

13:19:45  15        THE COURT:  Court will be in recess.  Thank you.

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.

6

7

8                    s/Lori A. Callahan
                     Lori Ann Callahan, RMR-CRR
9                    U.S. District Court, Suite 568
                     2 South Main Street
10                   Akron, Ohio  44308
                     (330) 252-6022
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25